**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JAMES WARNER MITCHELL,                CASE NO. 2:20-cv-13414

      *Plaintiff*,                              HON. MARK A. GOLDSMITH
*v.*                                                  DISTRICT JUDGE

COMISSIONER OF SOCIAL                    HON. PATRICIA T. MORRIS
SECURITY,                                        MAGISTRATE JUDGE

      *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 15, 17)

### I.  RECOMMENDATION

Plaintiff James Mitchell challenges the Commissioner of Social Security regarding a final decision denying his claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  The case was referred to the undersigned for review.  (ECF No. 2); *see* 28 U.S.C. § 636(b)(1)(B) (2012); E.D. Mich. LR 72.1(b)(3).  For the reasons below, I recommend **GRANTING** Plaintiff's motion for summary judgment, (ECF No. 15), **DENYING** the Commissioner's motion, (ECF No. 17), and remanding the decision.

### II.  REPORT

#### A. Introduction and Procedural History

Plaintiff first filed an application for a period of disability, DIB, and SSI on July 25, 2016, alleging that he became disabled on June 18, 2016.  (ECF No. 10-3, PageID.100.) Plaintiff was denied at the initial level and requested a hearing before an administrative

law judge ("ALJ").  (*Id.*)  On October 31, 2018, The ALJ determined that Plaintiff was not disabled.  (*Id.* at PageID.97, 113.)  Plaintiff did not appeal this decision.  (ECF No. 10-2, PageID.57.)

Plaintiff again protectively filed subsequent applications for DIB and SSI on February 1, 2019, and April 19, 2019, respectively.  (ECF No. 10-2, PageID.57; ECF No. 10-5, PageID.255, 257.)  He alleged that he became disabled on January 1, 2019.  (ECF No. 10-5, PageID.255.)  The Commissioner denied these claims on June 25, 2019. (ECF No. 10-4, PageID.116, 134.)  Plaintiff then requested a hearing before another ALJ, which occurred on March 3, 2020.  (*Id.* at PageID.196; ECF No. 10-2, PageID.74.)  The ALJ issued a decision on July 7, 2020, finding that Plaintiff was not disabled.  (ECF No. 10-2, PageID.69.)  The Appeals Council denied review on December 1, 2020.  (*Id.* at PageID.43.)  Plaintiff sought judicial review on December 31, 2020.  (ECF No. 1.)  The parties filed cross-motions for summary judgment and neither party filed a reply brief.  (*See* ECF Nos. 12, 13.)

**B.  Standard of Review**

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2012).  The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

(internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Id*. at 286 (internal citations omitted).

### C.  Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2012).   The Commissioner's regulations provide that disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520(a)(4) (2021); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could

perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486

F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was

not disabled. (ECF No. 10-2, at PageID.69.)  At step one, the ALJ found Plaintiff had not

engaged in substantial gainful activity since "January 1, 2019, the alleged onset date."  (*Id.*

at PageID.60.)  At step two, the ALJ concluded that Plaintiff had the following severe

impairments: diabetes mellitus with neuropathy; chronic kidney disease; cervical and

lumbar disc disorder; depressive disorder; bipolar disorder; gastritis and duodenitis;

cerebrovascular accident; essential hypertension; and hyperlipidemia.  (*Id.*)  The ALJ found

that Plaintiff's "history of diabetic retinopathy with macular edema" was a nonsevere

impairment.  (*Id.* at PageID.61.)  None of these impairments met or medically equaled a

listed impairment at step three.  (*Id.* at PageID.61–62.)  Next, the ALJ found that Plaintiff

had the residual functional capacity ("RFC"):

> to perform light work . . . except the claimant can never climb ladders, ropes,
> or scaffolds.  The claimant can occasionally climb ramps and stairs, balance,
> stoop, kneel crouch, and crawl.  The claimant is limited to frequent rotation,
> flexion, and extension of the neck.  The claimant is limited to frequent
> reaching overhead bilaterally.  The claimant must avoid all exposure to
> extreme heat, moving machinery, and unprotected heights.  The claimant is
> limited to simple, routine[,] and repetitive tasks  not done at a production rate
> pace.  The claimant requires a sit/stand option permitting change in position
> every [thirty] minutes if needed and without disturbing the workplace.  The
> claimant requires an assistive device such as a cane to ambulate during the
> workday.

(*Id.* at PageID.62.)  At step four, the ALJ found that Plaintiff could not perform his past

relevant work as a stock clerk, press operator, spray painter, or a cart attendant.  (*Id.* at

PageID.67.)   Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy, including, work as an information clerk, a record clerk, and a counter clerk.  (*Id.* at PageID.67–68.)   Accordingly, the ALJ concluded that Plaintiff was not disabled.  (*Id.* at PageID.68.)

### E.  Administrative Record

#### i.     Medical Evidence

Plaintiff suffers from several physical and mental impairments including diabetes, kidney disease, disc disorder, hypertension, depression, and bipolar disorder.  (ECF No. 10-2, PageID.60, 63–64.)   The combined effects of these conditions impact Plaintiff's mobility, vision, memory, and energy.  (*Id.*)   In 2019, Plaintiff suffered a stroke that he claims has exacerbated his symptoms, preventing him from working.  (*Id.* at PageID.63.)

Plaintiff's treating physician, Doctor Cheryl Canto, completed two forms describing Plaintiff's physical functional capacity.  First, in July 2019, Doctor Canto opined that Plaintiff was only capable of "low stress jobs."  (ECF No. 10-7, PageID.492.)   Plaintiff could walk for no more than four days in a single workday, and he needed to alternate between sitting and standing every hour.  (*Id.* at PageID.492–93.)   Doctor Canto stated that Plaintiff could lift less than ten pounds occasionally, and she noted several postural limitations.  (*Id.* at PageID.493–94.)   For example, Plaintiff could never crouch or climb stairs, and while his use of his left arm was uninhibited, he had a substantially limited use of his right arm.  (*Id.* at PageID.494.)   She further opined that Plaintiff's psychological

symptoms would exacerbate his physical limitations and she expected that Plaintiff would be absent more than four times per month due to his impairments. (*Id.* at PageID.492, 494.)

In February 2020, Doctor Canto completed the same form, but noted more significant limitations. (ECF No. 10-11, PageID.746.) Indeed, Doctor Canto believed that since the previous evaluation, Plaintiff had become incapable of even "low stress" jobs and that he would be "off task" at any job for more than a quarter of the workday. (*Id.* at PageID.744.) Plaintiff would also be absent more than seven days per month. (*Id.* at PageID.746.) Like her previous evaluation, Doctor Canto again opined that Plaintiff could lift up to ten pounds occasionally. (*Id.* at PageID.745.) She noted that Plaintiff could never bend, crouch, or climb ladders, but stated that he could "twist" and climb stairs up to one third of the workday. (*Id.* at PageID.746.) Plaintiff could walk less than "one block" continuously and he required a "walker[,] as needed." (*Id.* at PageID.744–45.)

Plaintiff's therapist, Linda Hernandez, completed a psychological RFC form on April 2, 2019. (ECF No. 10-7, PageID449.) Like Doctor Canto, Hernandez believed that Plaintiff would be off task for more than a quarter of the workday and that Plaintiff would be absent from work more than four times per month. (*Id.* at PageID.447, 449.) She opined that Plaintiff could not "[m]aintain attention for two-hour segment[s]," and she noted the Plaintiff could not "meet competitive standards" in several other areas of mental functioning. (*Id.* at PageID.447–49.) For example, Plaintiff could not adequately "understand and remember detailed instructions[,] . . . interact appropriately with the general public" or "understand and remember very short and simple instructions." (*Id.*)

Both the nonexamining psychologist and the nonexamining physician deferred to the prior ALJ's decision after determining that the record did not contain "new" and "material" evidence that Plaintiff's condition had worsened since Plaintiff's original application.  (ECF No. 10-3, PageID.146–50, 152.)  Specifically, the nonexamining psychologist recognized that Plaintiff had moderate mental limitations that affected his ability to "maintain sustained attention and concentration," but nonetheless opined that Plaintiff could "complete simple[,] non[-]skilled tasks."  (*Id.* at PageID.149–50.) The nonexamining physician noted that Plaintiff had several, moderate physical limitations, but reasoned that the record lacked sufficient evidence to justify a departure from the prior ALJ's decision.  (*Id.* at PageID.146–48.)

### ii.    Plaintiff's Testimony at the Administrative Hearing

The ALJ began the hearing by examining Plaintiff.  Plaintiff testified that since his last application, he had a "couple strokes" that exacerbated his conditions.  (ECF No. 10-2, PageID.81.)  Specifically, he stated that the stroke impaired his short-term memory and that he now required a cane to walk around.  (*Id.* at PageID.81–82.)  The strokes also caused Plaintiff to become easily fatigued.  (*Id.* at PageID.82.)  Because of his fatigue, Plaintiff could not perform any household chores.  (*Id.*)

Plaintiff testified that the strokes impaired his vision.  (*Id.* at PageID.83.) Accordingly, he could not drive and had difficulty watching television. (*Id.*) He explained, however, that he could see "bigger things," such as an object directly in front of him, and he stated that he had no difficulty walking around or opening doors.  (*Id.* at PageID.84.)

Plaintiff stated that he took medication daily, but that he had no side effects.  (*Id.* at PageID.82–83.)  He also testified that he could lift up to twenty-five pounds and that he could walk the distance of "a couple houses" without his cane before falling.  (*Id.* at PageID.84.)

The ALJ then allowed Plaintiff's attorney to examine him.  (*Id.* at PageID.85.) Plaintiff testified that he napped once per day, but that he would unintentionally fall asleep about three times per day.  (*Id.* at PageID.86.)  He also stated that he could only maintain his attention on a task for up to twenty minutes before he started to "zon[e] out."  (*Id.*)

Plaintiff explained that he also suffered from depression and as a result he would intermittently experience episodes where he felt "really moody and upset."  (*Id.* at PageID.87.)  These symptoms made it difficult for Plaintiff to interact appropriately with other people.  (*Id.*)

Plaintiff then testified that he experienced pain, numbness, and tingling in his hands and feet "all the time."  (*Id.*)  Accordingly, he had difficulty holding his hands and would frequently drop things.  (*Id.*)  Plaintiff also described issues with fine motor skills, such as "buttoning buttons" or "picking up change."  (*Id.*)  His pain also prevented him from standing up for more than "five" to "ten minutes."  (*Id.* at PageID.88.)  Plaintiff had no difficulty sitting.  (*Id.*)

### iii.    The Vocational Expert's Testimony at the Administrative Hearing

After Plaintiff testified, the ALJ then questioned the vocational expert ("VE").  (*Id.* at PageID.89.)  The ALJ asked the VE to consider a hypothetical person with the same age,

education, and past relevant work as Plaintiff, who could perform light work, except that he or she:

> [could] ever climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, crawl; [was] limited to frequent rotation, flexion, and extension of the neck[,] . . . [and] frequent reaching overhead bilaterally[. He or she needed to] avoid all exposure to extreme heat, moving machinery, and unprotected heights[, and] was limited to simple, routine tasks.

(*Id.* at PageID.90–91.)  The VE testified that, consistent with the Dictionary of Occupational Titles ("DOT") and his own personal experience, this person could not perform Plaintiff's past relevant work, but that the person could perform several jobs that were available in the national economy.  (*Id.* at PageID.91.)  For example, this person could work as an information clerk, DOT code 237.367-018, light work, approximately 57,000 jobs; an order filer, DOT code 209.587-034, light work, approximately 165,000 jobs; and a record clerk, DOT code 241.367-038, approximately 42,000 jobs.  (*Id.* at PageID.91.)

The ALJ then asked the VE to assume the same hypothetical except that the individual could only "perform simple, routine and repetitive tasks not done at a production rate pace," and the individual required the option to alternate between sitting and standing up as often as every thirty minutes.  (*Id.*)  The VE testified that this hypothetical person could not work as an order filler, but that the individual could still work as an information or record clerk.  (*Id.* at PageID.91–92.)   Additionally, the individual could work as a counter clerk, DOT code 249.366-010, light work, approximately 56,000 jobs.   (*Id.*)

The ALJ then asked the VE to assume the same person as in the second hypothetical, but to also assume that the person required a cane to ambulate.  (*Id.* at PageID.92.)  The

VE testified that the individual could perform the same work as in the previous hypothetical.  (*Id.*)

The ALJ then asked the VE to assume the same person as the last hypothetical, but to also assume that the person required a cane for balance as well as ambulation.  (*Id.*)  The VE explained that an individual who needed a cane for ambulation as well as balance would be off task whenever standing.  (*Id.* at PageID.92–93.)  Accordingly, such an individual could not perform any job that required him or her to stand for more than ten percent of the workday.  (*Id.*)

The ALJ then asked the VE to assume the same individual from the third hypothetical, but to further assume that the individual was limited to sedentary work.  (*Id.* at PageID.93.)  The VE testified that this person could work as an information clerk, DOT code 237.367-046, sedentary work, approximately 55,000 jobs; an office clerk, DOT code 249.587-018, sedentary work, approximately 63,000 jobs; and a sorter, DOT code 559.687-034, approximately 24,000 jobs.  (*Id.*)

Last, the ALJ, without specifying which previous hypothetical she was referring to, asked the VE to "add the language" that the hypothetical person would be off task twenty percent of the time and would miss two days per month.  (*Id.*)  The VE responded that either limitation would individually be work preclusive.  (*Id.* at 93–94.)  The VE also clarified that this "testimony along with the testimony regarding the time off-task, use of the cane for walk or balance, possible sit/stand option, and use of arms overhead" were based on his experience, not the DOT.  (*Id.*)

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision.  42 U.S.C. § 423(d)(5)(B) (2012).  The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

    (1)    Licensed physician (medical or osteopathic doctor);

    (2)    Licensed Psychologist, which includes:

        (i)    A licensed or certified psychologist at the independent practice level; or

        (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

    (3)    Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

    (4)    Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

    (5)    Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

     (6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

     (7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

     (8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior

administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.* § 404.1520c(c)(3). This factor will include the analysis of:

(i)   Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)  Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)   Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation

requirements."   The ALJ will consider "source-level articulation."   Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record."  *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate."  *Id.*  The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually."  *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be."  *Id.* § 404.1520c(b)(2).  As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.  We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we

articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)   Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)  Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

     (iii)    Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

     (iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

     (v)    Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

     (vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood,

thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as

consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.* § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . We will

consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

    (i)      [D]aily activities;

    (ii)     The location, duration, frequency, and intensity of . . . pain;

    (iii)   Precipitating and aggravating factors;

    (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)    Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)   Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

    (1)    The specific medical treatment is contrary to the established teaching and tenets of your religion;

    (2)    The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

### G. Arguments and Analysis

Plaintiff argues that the ALJ's Residual Functioning Capacity ("RFC") is not supported by substantial evidence.   Specifically, Plaintiff argues that the ALJ (1) improperly discounted plaintiff's treating sources and (2) found an under-restrictive RFC that inadequately accounted for Plaintiff's vertigo and his medication side-effects.   For the following reasons, although the ALJ's RFC findings were supported by substantial evidence, I suggest that the ALJ erred by considering herself bound to the prior ALJ's findings absent "new and material" evidence of a changed condition.

### a.  Treating Sources

The ALJ properly discounted Plaintiff's treating sources.   Plaintiff first argues that the ALJ improperly discounted the opinion of his treating physician, Doctor Canto.   Doctor Canto provided two medical opinions discussing Plaintiff's RFC—one in July 2019, and one on February 21, 2020.   (ECF No.10-7, PageID.494; ECF No. 10-11, PageID.746.)

The ALJ did not discuss the earlier opinion in her decision and Plaintiff asserts that this "is in and of itself reversible error."   (ECF No. 15, PageID.926.)   However, the regulations do not require ALJ's to discuss every medical opinion from each medical

source individually—they require ALJs to discuss the opinions of each medical source, "*together* in a single analysis. . . ."  20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2021) (emphasis added).  The ALJ discussed Doctor Canto's second opinion in detail, and her discussion of Doctor Canto's second opinion this opinion appears to have applied equally to Doctor Canto's first opinion.  (*See* ECF No.10-2, PageID.64, 66.)  Indeed, both opinions were "consistent with each other in almost all regards," and of the two, the ALJ discussed the more recent and more restrictive opinion.  (ECF No. 15, PageID.926; *compare* ECF No.10-7, PageID.494, *with* ECF No. 10-11, PageID.746.)

Moreover, the ALJ's decision to discount Doctor Canto's second opinion is supported by substantial evidence.  First, although Plaintiff suggests otherwise, the ALJ's failure to discuss Doctor Canto's treating relationship with Plaintiff and the internal consistency of Doctor Canto's two opinions was not reversible error.  Indeed, a physician's relationship to the claimant is merely a factor that must be considered by the ALJ, and, unlike supportability and consistency with other evidence, the ALJ need not explain how he or she considered this factor.  20 C.F.R. §§ 404.1520c(c), 416.920c(c).  Further, a treating source's internal consistency among its own opinions (as opposed to its consistency with evidence from other sources) is not a factor the regulations require ALJ's to consider, let alone articulate.  *See id.*; *Young v. Kijakazi*, No. 20-cv-03604, 2021 WL 4148733, at *10 (S.D.N.Y. Sept. 13, 2021) ("[N]othing in the regulations . . . specifically requires that an ALJ discuss [a medical source's] 'internal' consistency, or [requires] that, where an ALJ finds that multiple medical opinions are inconsistent with other evidence in

the record, such inconsistency is necessarily trumped by consistency *among* those medical opinions.") (emphasis in original).

The ALJ found that Doctor Canto's RFC was inconsistent with evidence from other sources.  Specifically, the ALJ noted that Doctor Canto's course of treatment was "not consistent with what one would expect if [Plaintiff] were truly as limited."  (ECF No. 10-2, PageID.66.)  Indeed, Doctor Canto was one of only a few medical professionals whom Plaintiff saw before his stroke, and after Plaintiff's stroke, Plaintiff saw no other sources for his physical impairments besides Doctor Canto, notwithstanding a single visit to a neurologist.  (*See* ECF Nos. 10-7–10-11.)  The ALJ noted that Plaintiff took medication for his diabetes and underwent a "conservative[]" treatment for his kidney disease.  (ECF No. 10-2, PageID.64; ECF No. 10-11, PageID.753.)  Plaintiff also underwent physical therapy from July through September of 2019 for his cervical and lumbar disc disorder and reported "much improvement."  (ECF No. 10-2, PageID.64; ECF No. 10-8, PageID.497); *cf. Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015) (holding that substantial evidence supported an ALJ's decision to discount a medical opinion that conflicted with a "conservative treatment" regimen).  And, although Doctor Canto opined that Plaintiff could lift no more than ten pounds, Plaintiff testified that he could lift up to twenty-five pounds.  (ECF No. 10-23, PageID.84; ECF No. 10-11, PageID.745.)

Moreover, Doctor Canto's own reports did not "reveal the type of significant clinical and laboratory abnormalities one would expect if [Plaintiff] were in fact disabled . . . ." (ECF No. 10-2, PageID.66.)  Doctor Canto regularly made note of normal neurological

findings, both before and after Plaintiff's stroke.  (ECF No. 10-11, PageID.764–65, 778, 785, 793, 809, 816, 824, 833, 841, 848, 854, 860, 876, 882.)  Likewise, the neurologist Plaintiff consulted after his stroke had relatively normal objective findings.  (ECF No. 10-10, PageID.715.)  Before his stroke, Plaintiff worked at Taco Bell and could "lift[] heavy bags of garbage overhead into a dumpster."  (ECF No. 10-2, PageID.64; ECF No. 10-8, PageID.497, 503, 505, 507, 509, 512, 516.)  Additionally, both before and after his stroke, Plaintiff often denied dizziness, impaired gait, weakness, or numbness.  (ECF No. 10-11, PageID.785, 792, 808, 823, 832, 840, 847, 853, 882, 889, 894–95.)

The ALJ did not discount Doctor Canto's opinion entirely.  Indeed, the ALJ found limitations in the same areas as Doctor Canto, but found that other objective evidence in the record supported a marginally less restrictive RFC.  For example, while Doctor Canto opined that Plaintiff required a two-handed walker, the ALJ found that Plaintiff required a cane to ambulate.  (*Compare* ECF No. 10-2, PageID.62, *with* ECF No. 10-11, PageID.745.)  While Doctor Canto suggested that Plaintiff may need to alternate between sitting and standing every ten to twenty minutes, the ALJ found that Plaintiff would only need to switch positions every half hour.  (*Compare* ECF No. 10-2, PageID.62, *with* ECF No. 10-11, PageID.744.)  Although Doctor Canto found that Plaintiff could lift no more than ten pounds at once, the ALJ found that Plaintiff could lift up to twenty pounds.  (*Compare* ECF No. 10-2, PageID.62, *with* ECF No. 10-11, PageID.745); *see* SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983).  Moreover, while Doctor Canto stated that Plaintiff was "incapable of even low stress jobs," the ALJ found that Plaintiff could only perform

"simple, routine[,] and repetitive tasks not done at a production rate pace." (*Compare* ECF No. 10-2, PageID.62, *with* ECF No. 10-11, PageID.744.)

The differences between Doctor Canto's opinion and the ALJ's findings are relatively minor, and the ALJ's modestly less restrictive RFC is supported by other objective evidence in the record. Thus, by asking the Court to adopt Doctor Canto's RFC over the ALJ's, Plaintiff is effectively asking the Court to reweigh the evidence—this the Court cannot do. *See Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th Cir. 1982).

Similarly, the ALJ properly discounted the opinion of Plaintiff's therapist, Ms. Hernandez. Ms. Hernandez found extreme limitations that were unsupported by objective evidence from both her own evaluations of Plaintiff as well as other sources. (ECF No. 10-2, PageID.66.) Specifically, Ms. Hernandez found that Plaintiff would be off task a quarter of each day and absent from work once per week. (ECF No. 10-7, PageID.447, 449.) She also opined that Plaintiff could not maintain attention for more than two hours at a time and that he could not meet competitive standards in many areas of functioning. (*Id.* at PageID.446–49.)

However, on the day Ms. Hernandez wrote her opinion, her contemporaneous evaluation of Plaintiff was unremarkable, notwithstanding a depressed mood and sporadic eye contact. (ECF No. 10-11, PageID.721–22.) Plaintiff communicated effectively, displayed a "normal" attitude, and was alert. (*Id.*) Ms. Hernandez also noted that Plaintiff's thought content was unimpaired. (*Id.*) Although later examinations performed

by Ms. Hernandez noted memory loss, they were otherwise similar, and they even suggested that Plaintiff was improving. (*Id.* at PageID.727–38.)

Other medical evidence in the record was largely inconsistent with Ms. Hernandez's opinion. While Doctor Canto often noted that Plaintiff's memory was impaired, Doctor Canto also frequently noted that Plaintiff had normal memory. (*Id.* at PageID.793, 816, 833–34, 876, 883.) Likewise, while Plaintiff would sometimes claim that he had memory loss, at other times he would deny any memory loss. (ECF No. 10-10, PageID.586, 715; ECF No. 10-11, PageID.832.) Doctor Canto also had mixed findings regarding Plaintiff's insight and judgment. (ECF No. 10-11, PageID.752, 765, 778, 785, 793, 797, 809, 816, 824, 833, 841, 854, 860, 876, 882.) Given the lack of support from Ms. Hernandez's own findings and the rest of the record, I suggest that the ALJ's decision to discount Ms. Hernandez's opinion was supported by substantial evidence.[1]

### b. Whether the ALJ's Functional Limitations Were Supported by Substantial Evidence

Plaintiff also argues that the ALJ's functional limitations were not supported by substantial evidence, and that this led the ALJ to erroneously find that Plaintiff could perform available work in the national economy at step five.

First, Plaintiff argues that the ALJ erred by neglecting to account for Plaintiff's vertigo and his need for a cane while standing. However, the ALJ accounted for both

---

[1] As with Doctor Canto, Plaintiff argues that the ALJ erred by not discussing his treatment relationship with Ms. Hernandez. (ECF No. 15, PageID.927–28.) However, a medical source's treating relationship is merely a factor that the ALJ must consider, and it is not one that the ALJ must expressly articulate in his or her decision. *See* 20 C.F.R. §§ 404.1520c(b)–(c), 416.920c(b)–(c).

concerns.   Indeed, the ALJ acknowledged that Plaintiff had vertigo, "residual balance issues," and a "slow, cautious gait" following his stroke.  (ECF No. 10-2, PageID.63–65.) But the ALJ also found that Plaintiff's neurological findings were otherwise normal and that Doctor Canto overstated the severity of his balance issues.  (*See id.* at PageID.64–66..) Even so, the ALJ still found that Plaintiff needed to alternate between sitting and standing every thirty minutes and that he required a cane while walking.  (*Id.* at PageID.62.)  Plaintiff argues that he would also need a cane while standing still, but the ALJ's finding that Plaintiff only required a cane while walking, but not while standing, is a judgment call— the evidence in the record does not clearly support one finding over the other.[2]  *See Mullins*, 680 F.2d at 472.

Essentially, Plaintiff argues that the ALJ fell "woefully short of truly outlining . . . the severity of" Plaintiff's vertigo, but this argument, at best, merely suggests that this Court find substantial evidence to support a different, more restrictive finding.  However, this Court's inquiry is limited to whether the ALJ's findings are supported by substantial evidence.  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

Plaintiff next argues that the ALJ "never considered [his] severe side effects from his medications."  (ECF No. 15, PageID.924.)  Yet, as Plaintiff concedes, the ALJ expressly recognized that Plaintiff took prescribed medications.  (ECF No. 15, PageID.924; ECF No.

---

[2] Notably, the Vocational Expert ("VE") testified that Plaintiff would be off task whenever he used a cane to stand still, and that Plaintiff could not perform work in the national economy if he was off task for more than ten percent of the workday.  (ECF No. 10-2, PageID.92–93.)  Thus, if Plaintiff required a cane to balance while standing still, then he would be precluded from working any job that required him to stand for more than ten percent of the workday.  (*Id.*)

10-2, PageID.64.)  Although the ALJ did not discuss their side effects, she was certainly aware of them, and the record contains substantial evidence to support the ALJ's decision to discount the severity of Plaintiff's medication side effects.  Indeed, at the hearing, the ALJ asked Plaintiff whether he experienced "any side effects" from his medications, but Plaintiff answered that he did not.  (ECF No. 10-2, PageID.83.)  Further, insofar as Plaintiff's medications exacerbated his dizziness, the ALJ accounted for this by allowing Plaintiff a "sit/stand" option and permitting him to use a cane while walking.  (*Id.* at PageID.62, 65 ("Any limitations from claimant's residual vertigo have been accounted for in the above [RFC].").)

Last, Plaintiff argues that the ALJ's finding that Plaintiff would not be off task more than ten percent of the time was not supported by substantial evidence.  Both Doctor Canto and Ms. Hernandez opined that Plaintiff would be off task well over ten percent of the time. (ECF No. 10-7, PageID.447, ECF No. 10-11, PageID.744.)[3]  However, both conflicted with the non-examining physician and psychologist, neither of whom found any such limitation.[4]  (ECF No. 10-3, PageID.129–35.)  Plaintiff further argues that if the "ALJ were unable to pinpoint the level of off-task behavior herself" then she should have obtained a medical expert's opinion.  (ECF No. 15, PageID.925.)  However, the ALJ expressed no concerns over finding that Plaintiff would not be off task for more than ten percent of the

---

[3] A finding that Plaintiff would be off task for more than ten percent of the workday would be work preclusive.  (ECF No. 10-2, PageID.92–93.)

[4] Plaintiff argues that collectively, his impairments affect his ability to work on a sustained basis.  *See* SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985).  However, the ALJ found that Plaintiff could work on a sustained basis, and the previously discussed facts provide substantial evidence to support this finding. (ECF No. 17, PageID.66.)

time, and this finding is supported by substantial evidence for the previously discussed reasons.  Moreover, the decision to order a consultative examination is within the ALJ's discretion, and because the ALJ had access to medical expert opinions that accounted for the entire medical record, she was not required to further develop the record with additional medical opinion evidence.  *Landsaw v. Secy. Of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (first citing 20 C.F.R. § 404.1517 (2021); and then quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)); *see Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866, at *2 (N.D. Ohio Oct. 21, 2011).

Accordingly, I suggest that the ALJ's RFC finding is supported by substantial evidence.

### c.  Whether the ALJ Legally Erred by Adopting Findings from the Prior ALJ Decision

Although the ALJ's RFC finding was supported by substantial evidence, the ALJ erred at both steps four and five by treating the prior ALJ's findings as binding absent "new and material evidence" of a changed condition.  (ECF No. 10-2, PageID.57.)  While the ALJ could have chosen to give deference to the prior ALJ's findings, she was not required to.  Indeed, the ALJ could have disregarded the prior ALJ's findings completely when making her factual findings if she found those findings were not supported by substantial evidence.  However, because the ALJ considered herself bound by the prior ALJ's findings, I suggest that she adopted the prior ALJ's findings without meaningfully considering any new evidence that supported a different conclusion.

Although this argument was not raised by Plaintiff, I suggest that the Court may properly raise the issue *sua sponte*. This District has often recognized that "in Social Security cases, the failure to submit a particular legal argument is 'not a prerequisite to the Court[] reaching a decision on the merits[] or . . . finding, *sua sponte*, . . . grounds for reversal." *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *11 n.2 (E.D. Mich. Sept. 25, 2013); *see also Morris v. Comm'r of Soc. Sec.*, No. 2:18-12090, 2019 WL 375572, at *13 (E.D. Mich. July 18, 2019) (collecting cases). Indeed, in reviewing Plaintiff's arguments, the Court was required to "review the administrative record in some detail," and that review uncovered an "obvious and significant legal error." *Trainor v. Comm'r of Soc. Sec.*, No. 13-10093, 2014 WL 988993, at *23 (E.D. Mich. Mar. 13, 2014); *Andras v. Comm'r of Soc. Sec.*, No. 18-cv-10192, 2019 WL 1246253, at *4 n.2 (E.D. Mich. Feb. 11, 2019).

In her decision, the ALJ explained that she relied on AR 98-4(6) and AR 98-3(6), which provide that "when adjudicating a subsequent disability claim with an adjudicated period," an ALJ must adopt a prior ALJ's findings, unless "the record contains new and material evidence." (ECF No. 10-2, PageID.57 (first citing SSAR 98-4(6), 1998 WL 283902 (June 1, 1998), and then quoting SSAR 98-3(6), 1998 WL 283901 (June 1, 1998)).)

The prior ALJ, in 2018, found that Plaintiff had the following RFC:

[t]he claimant has the [RFC] to perform light work . . . except the claimant can never climb ladders, ropes, or scaffolds. The claimant can occasionally climb ramps and stairs, balance, stoop, kneel crouch, and crawl. The claimant is limited to frequent rotation, flexion, and extension of the neck. The claimant is limited to frequent reaching overhead bilaterally. The claimant must avoid all exposure to extreme heat, moving machinery, and unprotected heights. The claimant is limited to simple and routine tasks.

(ECF No. 10-3, PageID.106.)  Here, the current ALJ adopted this RFC verbatim, but under

AR 98-3(6) and AR 98-4(6), she found that the record contained new and material evidence

that supported a more restrictive RFC.  Accordingly, she added the following limitations:

> The claimant is limited to simple, routine[,] and repetitive tasks  not done at
> a production rate pace.  The claimant requires a sit/stand option permitting
> change in position every [thirty] minutes if needed and without disturbing
> the workplace.  The claimant requires an assistive device such as a cane to
> ambulate during the workday.

(ECF No. 10-2, PageID.62.)  Acquiescence Rulings 98-3(6) and 98-4(6) interpret

*Dennard v. Sec'y of Health & Hum. Servs.*, 907 F.2d 598 (6th Cir. 1990) and *Drummond*

*v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), respectively.  Based on these two

opinions, the Rulings instruct ALJs to give binding weight to the findings of a prior ALJ,

even when adjudicating a time period which the prior ALJ did not consider, unless the

record contained "new and material evidence" of a changed condition.    SSAR 98-4(6),

1998 WL 283902, at *2–3; SSAR 98-3(6), 1998 WL 283901, at *2–3.  However, both

*Dennard* and *Drummond* were significantly narrowed in *Earley v. Comm'r of Soc. Sec.*,

893 F.3d 929, 931–34 (6th Cir. 2018) and as a result, the ALJ applied the wrong legal

standard which led her to fail to consider evidence related to Plaintiff's educational level.

In *Dennard*, the Sixth Circuit held that an ALJ was "precluded by estoppel" from

reconsidering whether a claimant could perform his past relevant work after another ALJ,

deciding an earlier application, determined that the claimant could perform his past relevant

work.  907 F.2d at 600.  Subsequently, the Social Security Administration promulgated

SSAR 98-3(6) which interpreted *Dennard* and instructed ALJs that they "must adopt"

findings from earlier decisions, "unless there is new and material evidence relating" to the

prior ALJ's finding.  SSAR 98-3(6), 1998 WL 28390, at *3.  The ruling applied even where a new application alleged disability during a timeframe that succeeded the earlier application.  *See id.*

After *Dennard*, the Sixth Circuit decided *Drummond*, which, relying partially on Court's holding in *Dennard*, explicitly held that where an ALJ makes a final determination concerning a claimant's entitlement to benefits, all of the ALJ's *findings* are binding on the parties in all subsequent applications absent evidence of a "changed condition."  126 F.3d at 842.  The *Drummond* Court reasoned that "principles of res judicata" prevent ALJs from challenging earlier findings, absent changed circumstances.  *Id.* at 841–42.[5]  In several unpublished decisions following *Drummond*, the Sixth Circuit applied this rule even where the new application concerned periods of time that were not addressed by the Administration's prior decision.  *See, e.g.*, *Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015); *Haun v. Comm'r of Soc. Sec.*, 107 F. App'x 462, 464 (6th Cir. 2004).

However, in *Earley*, the Sixth Circuit significantly restricted the scope of *Drummond* and *Dennard*.  The Sixth Circuit explained that the *Drummond* Court "overstate[d]" how res judicata applied to subsequent applications.  *Earley*, 893 F.3d at 933.  The *Earley* Court held that while the *Drummond* Court was correct that "res judicata may apply to administrative proceedings," res judicata only prevented subsequent applications "for the same period of time," that was considered in the prior application.  *Id.*

---

[5] The Social Security Administration promulgated SSAR 98-4(6), interpreting *Drummond*, on the same day that it promulgated SSAR 98-3(6).  The instructions in SSAR 98-4(6) are identical to those in SSAR 98-3(6).

Thus, ALJ's are not bound by prior findings when considering periods of disability that succeed the time period adjudicated in the earlier decision. *Id.* Indeed, because "human health is rarely static" an "earlier proceeding . . . could rarely, if ever, have 'actually litigated and resolved' whether a person was disabled at some later date." *Id.* Thus, ALJ's must "giv[e] a fresh look" to periods of disability that were not addressed in the prior ALJ's decision. *Id.* at 931, 934. Still, an ALJ at a later hearing need not "ignore" a prior ALJ's findings—"[a] later [ALJ] may" at least "consider what an earlier ALJ did . . . ." *Id.* at 934. An applicant whose "second filing mimics the first one" should "not have high expectations about success." *Id.* at 933.

Here, the ALJ incorrectly evaluated the prior ALJ's finding under *Dennard* and *Drummond*, and it is not clear whether the ALJ adequately considered Plaintiff's RFC after January 1, 2019, Plaintiff's new alleged onset date. Although the present ALJ found that the record contained new and material evidence that justified a departure from the prior ALJ's findings, she did not specify which parts of the prior ALJ's RFC she felt free to depart from. (ECF No. 10-2, PageID.63.) Indeed, although the ALJ apparently felt that she could properly add some limitations, most of her RFC was copied directly from the prior ALJ. (*Compare id.* at PageID.62, *with* ECF No. 10-3, PageID.106.) This suggests that the "new and material" evidence only pertained to the limitations she added to the RFC, and that she still felt bound to adopt the remainder of the prior ALJ's RFC finding.

By treating the prior ALJ's findings as controlling, the ALJ has not "giv[en] a fresh look" to Plaintiff's RFC during the time after the prior ALJ's decision. *Earley*, 893 F.3d at 931. The prior ALJ rendered a decision October 31, 2018, and none of Plaintiff's

34

medical evidence after that date was considered by the prior ALJ.  (ECF No. 10-3, PageID.113.)  Even though Plaintiff's present application alleged that his disability began on January 1, 2019, the ALJ here assumed that the prior ALJ's finding applied to a time period she had not considered, simply because the present ALJ lacked "new and material" evidence to support a different RFC finding.  (ECF No. 10-2, PageID.63.)  But this is the incorrect standard.  As the *Earley* Court recognized, human health fluctuates and changes with age; therefore, the ALJ should have looked freely at the record to determine Plaintiff's RFC after 2018, without holding any new evidence to a heightened standard.  893 F.3d at 933–34.

The ALJ's failure to give Plaintiff's new medical evidence a fresh look was a harmful error because the record may have contained substantial evidence supporting a more restrictive RFC.  For example, Doctor Canto opined that Plaintiff had greater restrictions on the use of his neck and extremities than what the prior ALJ found.  (ECF No. 10-11, PageID.745.)  Doctor Canto also opined that Plaintiff could lift no more than ten pounds and that he could never stoop or crouch.  (*Id.* at PageID.745–46.)  Although both ALJs' RFC findings were supported by substantial evidence, and although the current ALJ may have relied on substantial evidence in discounting Doctor Canto's opinion and finding that Plaintiff's conditions had not materially changed, the current ALJ was not required to adopt the prior ALJ's findings if substantial evidence supported different findings.  *Earley*, 893 F.3d at 933.  However, the current ALJ did not consider changing the prior ALJ's RFC—once she found that Plaintiff's conditions had not materially

changed, she simply applied res judicata and adopted the prior ALJ's RFC.[6] (*See* ECF No. 10-2, PageID.62–66.)

To be clear, the current ALJ erred not because she credited the prior ALJ's finding, but because she treated it as binding. *See Earley*, 893 F.3d at 933. Even if Plaintiff's symptoms had not changed since her prior application, the ALJ could have completely ignored the prior ALJ's finding and assigned a different RFC if supported by substantial evidence. *See id.* The ALJ also could have properly found that there were no significant changes to Plaintiff's conditions, and, in the interest of "consistency," adopted the prior ALJ's findings after determining them to be persuasive. *See id.* at 931, 933–34. The bottom line is that the ALJ here should have freely considered the new evidence herself, instead of blindly deferring to the prior ALJ's findings. *See id.* Because the ALJ did the latter, Plaintiff was denied a fair consideration of his RFC. Therefore, I suggest remanding

---

[6] Other courts have reasoned that even where an ALJ purports to follow *Drummond*, the ALJ has not erred if he or she has considered the new evidence. *See, e.g.*, *Goins v. Saul*, No. 19-117, 2020 WL 1290784, at *6 (E.D. Ky. Mar. 18, 2020). While I generally agree with this approach, I note that merely discussing the new evidence is not enough to show that it was considered. The new ALJ must show that he or she is willing to depart from the prior ALJ's findings, such as by modifying the prior ALJ's RFC finding absent materially changed circumstances. *See Alexander v. Berryhill*, No. 5:18-cv-163-GFVT, 2019 WL 2250631, at *5 (E.D. Ky. May 24, 2019); *Harrell v. Comm'r of Soc. Sec.*, No. 18-10698, 2020 WL 435229, at *7 (E.D. Mich. Jan. 28, 2020) (finding the ALJ's addition of new limitations to the RFC meant that he did not actually adopt the prior RFC, even though the language in the ALJ decision suggested he was required to do so). *Contra Goins*, 2020 WL 1290784, at *6 ("Even if the evidence Goins points to could support a more limited RFC than that which ALJ Reynolds assigned, the Court must still affirm ALJ Reynolds's RFC determination, as it was based on substantial evidence."). If an ALJ feels *bound* to default to prior findings, then he or she has not actually given a fresh look to the new evidence, no matter how much the ALJ discusses the evidence in his or her decision. These discussions would merely be a façade, hiding a predetermined outcome. Thus, an ALJ who purports to be bound by *Drummond*, and complies with both *Drummond* and SSAR 98-4(6), cannot be said to have genuinely considered the new evidence even if the ALJ discusses them at length or adopts new findings. Therefore, the ALJ's extensive RFC discussion in this case, while supported by substantial evidence, does not comply with *Earley*.

this case so that the ALJ can properly consider Plaintiff's RFC under *Earley*.[7]  *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) ("[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow [the proper legal standards] and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'").

### Conclusion

For the previously discussed reasons, I recommend **GRANTING** Plaintiff's motion, (ECF No. 15), **DENYING** Defendant's motion, (ECF No. 17), and remanding the decision.

### III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have

---

[7] I suggest declining to award benefits here because "such a ruling 'is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking.'"  *Id.* at 934–35.  That is not the case here—applying the correct standard, the ALJ might still arrive at the same outcome.  Therefore, remand is appropriate to correct this error.

to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: December 14, 2021                         S/ PATRICIA T. MORRIS
                                                Patricia T. Morris
                                                United States Magistrate Judge